DECISION AND JOURNAL ENTRY
{¶ 1} Samantha K. and Earl K. each appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their minor child, G.K., and placed him in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Samantha K. ("Mother") and Earl K. ("Father") are the unmarried parents of G.K., born December 19, 2006. Shortly after the child's birth, hospital personnel notified CSB that G.K. tested positive for amphetamines and Mother tested positive for cocaine. CSB filed a complaint in juvenile court, alleging that the child was abused and dependent, and sought emergency temporary custody. The allegation of abuse was subsequently dismissed, but G.K. was adjudicated to be dependent, based on suicidal ideations by Mother while in the hospital. In due course, G.K. was placed in the temporary custody of the agency. *Page 2 
 {¶ 3} The trial court adopted a case plan, which required the parents to participate in counseling and parenting classes, attend visitation consistently, obtain a parenting/psychological assessment and follow recommendations, address substance abuse issues, and be able to meet the basic needs of the child.
 {¶ 4} The case proceeded to a hearing on CSB's motion for permanent custody, motions for legal custody to the parents or to relatives, and Father's motion for a six-month extension. On May 20, 2008, the trial judge granted permanent custody to CSB and denied all outstanding motions. Each parent has appealed and has raised three assignments of error for review.
 II. MOTHER'S ASSIGNMENT OF ERROR I. "THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO SUMMIT COUNTY CHILDREN SERVICES (SCCS), BECAUSE SCCS FAILED TO FILE A TIMELY ADOPTION CASE PLAN UNDER ORC § 2151.413."
 {¶ 5} Mother asks this Court to recognize the failure of CSB to file an adoption case plan at the time it filed its motion for permanent custody as plain error. In support of her argument she relies on language in R.C. 2151.413(E) and the appellate decision in In reT.R., 2d Dist. No. 22291, 2007-Ohio-6593, motion to certify conflict allowed, 117 Ohio St.3d 1456, 2008-Ohio-1635.
 {¶ 6} Subsequent to the appellate briefing of this case, the Ohio Supreme Court issued its decision in In re T.R. In re T.R., Slip Opinion No. 2008-Ohio-5219. In that opinion, the high court held that "R.C. 2151.413(E) requires a children-services agency seeking permanent custody of a child to update the child's case plan to include adoption plans, but it does not *Page 3 
require the agency to perform this action before the juvenile court rules on the motion for permanent custody." Id. at ¶ 17.
 {¶ 7} In the present case, CSB filed an amended case plan that addressed adoption and permanency prior to the permanent custody hearing. CSB also filed a Comprehensive Assessment Planning Model that addressed case status, case progress, and focused upon adoption as the permanency goal for G.K prior to the issuance of the trial court decision. Either document would more than satisfy the requirements set forth in the Ohio Supreme Court decision in In re T.R. Accordingly, Mother's first assignment of error is overruled.
 MOTHER'S ASSIGNMENT OF ERROR II. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN QUALIFYING DUSTIN WYGANT AS AN EXPERT WITNESS WITHOUT ESTABLISHING PROPER FOUNDATION UNDER EVID.R. 104(A) AND EVID.R. 702."
 {¶ 8} Mother asserts that the trial court erred when it qualified Dustin Wygant, who conducted parenting evaluations of Mother and Father, as an expert witness and also when it accepted his recommendation for permanent custody. Mother contends that Dr. Wygant should not have been certified as an expert witness because at the time he prepared his report, he was still a psychology trainee and had not yet been awarded his Ph.D. or license. Mother also argues that Dr. Wygant's recommendation should not have been accepted because it was based on faulty information. Neither argument has merit.
 {¶ 9} At the time of the parents' evaluations, this assessor had earned a bachelor's degree in psychology, a master's degree in clinical psychology, and was a completing an internship, which he described as the final step of his doctoral training in psychology. By the time of the permanent custody hearing, Dr. Wygant was still not licensed, but had obtained his Ph.D. in clinical psychology with a specialization in psychological assessment and was *Page 4 
completing a post-doctoral residency. He had completed several clinical rotations, including one year at Psychodiagnostic Clinic doing evaluations for the Summit County Court of Common Pleas, two years at Coleman Professional Services doing treatment and psychological evaluations, and nearly two years at Summit Psychological Associates doing counseling and psychological evaluations for the court. He had conducted more than 200 psychological evaluations. Dr. Wygant testified that he conducted the evaluations of these parents under the supervision of a licensed clinical psychologist.
 {¶ 10} "Under Evid. R. 702(B), an expert may be qualified by reason of his or her specialized knowledge, skill, experience, training,or education to give an opinion that will assist the [trier of fact] in understanding the evidence and determining a fact at issue." (Emphasis added.) State v. Drummond, 111 Ohio St.3d 14, 32, 2006-Ohio-5084, at ¶ 113. The Ohio Supreme Court has emphasized that expert status does not require special education, certification, or complete knowledge of the field in question. Id. It is necessary only that the witness's specialized knowledge, skill, experience, training or education "will aid the trier of fact in performing its fact-finding function." Id. The decision of the trial court whether an individual qualifies as an expert will be overturned only for an abuse of discretion. Id. at ¶ 114. See, e.g., State v. Fenton (1990), 68 Ohio App.3d 412, 430-31 (qualifying a fourth year doctoral student and psychology intern as an expert in child sexual abuse). This Court does not find that the trial court abused its discretion in qualifying Dr. Wygant as an expert witness.
 {¶ 11} Mother also argues that the witness's recommendation was based on faulty information. In specific, she claims that the witness did not inquire about Mother's pregnancy, that Dr. Wygant obtained most of his information from CSB, and that he concluded that Mother was a cocaine abuser based on little evidence. *Page 5 
 {¶ 12} "Weaknesses in the factual bases of an expert's testimony go to the weight and credibility of the expert's testimony, not to its admissibility." Dejaiffe v. KeyBank USA Natl. Assn., 6th Dist. No. L-05-1191, 2006-Ohio-2919, at ¶ 19. As this Court has previously stated, once expert testimony is properly before the trial court, the "burden falls on the opposing party to discredit or minimize the expert's testimony through cross-examination." Johnson v. Knipp (1973),36 Ohio App.2d 218, 220. It then becomes the role of the trier of fact to assess the expert's credibility and to assign weight to the expert's testimony and opinions. State v. Adams, 103 Ohio St.3d 508, 2004-Ohio-5845, at ¶ 84; Pangle v. Joyce (1996), 76 Ohio St.3d 389, 395.
 {¶ 13} In this case, Mother's counsel was permitted to fully cross-examine the expert witness. And, in fact, the matters complained of by Mother were raised through her own counsel's examination of the witness. Because the trier of fact in this case was the trial judge, he is presumed to have followed the law and to have properly considered the evidence. State v. Dyer, 8th Dist. No. 88202, 2007-Ohio-1704, at¶ 20. Absent any demonstration that the trial judge did not do so, we find no merit in Mother's second assignment of error.
 MOTHER'S ASSIGNMENT OF ERROR III. "THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE, AND THE GRANT OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 FATHER'S ASSIGNMENT OF ERROR II. "THE TRIAL COURT'S [DECISION] AWARDING PERMANENT CUSTODY TO SUMMIT COUNTY CSB WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE."
 {¶ 14} Mother and Father each argue that the judgment of the trial court was not supported by the evidence. *Page 6 
 {¶ 15} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95,99.
 {¶ 16} The trial court found that the first prong of the permanent custody test was satisfied because the child could not or should not be placed with either parent within a reasonable time. In support of that finding, the trial court relied upon R.C. 2151.414(E)(1), that the parents had failed to remedy the conditions causing the child to be placed outside the home, and R.C. 2151.414(E)(4), that the parents had not demonstrated a commitment to their child.
 {¶ 17} R.C. 2151.414(E)(4) provides:
 "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]"
In factual support of its finding pursuant to R.C. 2151.414(E)(4), the trial court found that both parents had failed to visit G.K. consistently and that they had failed to satisfy other case plan requirements. The court particularly noted that Father made no effort to maintain contact with the agency or with the guardian ad litem regarding his son while he was incarcerated. Upon review, we conclude that the record contains clear and convincing evidence in support of this finding. *Page 7 
 {¶ 18} Over the course of this proceeding, the parents attended approximately half of the scheduled visits with their son. All of the visits were supervised and were conducted at the visitation center. The visits did not progress to monitored or unsupervised status, nor were there any visits permitted to be off-site or over-night. While Father's visits were said to have improved after 11 months, it was only to the point where the child did not cry through the entire visit. The parents were offered expanded visitation, but they declined. In addition, Father failed to notify the agency when he was about to enter jail for a probation violation. Although he claimed he asked Mother to inform the agency, she could only be said to have done so months later and in a curt and flippant manner. According to the caseworker, Mother responded to her inquiry about Father's whereabouts at a pre-trial by saying that "I should know where he's at, I'm the one that put him there." The caseworker was unable to locate or communicate regularly with Father about G.K. during this time and Father did not have any contact with G.K. from November 7, 2007 until April 1, 2008.
 {¶ 19} Evidence that the parents were uncooperative also supports this conclusion. The caseworker testified that the parents cooperated with service providers at first, but soon became uncooperative. They did not answer the door when the caseworker came to the house, and Mother returned telephone calls by leaving messages for the caseworker outside of office hours. Dr. Wygant testified that the parents were not forthcoming with information, failed to sign various releases, and tended to be deceptive. The guardian ad litem testified that she had difficulty meeting with the parents because of their inconsistency in attending visitation. Father's lack of appropriate commitment is also demonstrated by his decision to use cocaine while on probation during this case, triggering a jail sentence, and then failing to notify the agency of his sentence. *Page 8 
 {¶ 20} We conclude that the trial court's determination that the child could not or should not be placed with either parent within a reasonable time, as a result of the parents' lack of commitment to their child pursuant to R.C. 2151.414(E)(4), is amply supported by the evidence before the trial court. It is, therefore, unnecessary for this Court to consider the finding pursuant to R.C. 2151.414(E)(1).
 {¶ 21} Next, the trial court found that it was in the best interest of G.K. to be placed in the permanent custody of the agency. Mother does not contest this finding, but Father argues that the trial court erred in finding that permanent custody was in the best interest of G.K. When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 "(5) Whether any of the factors in divisions (E) (7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5).
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24. *Page 9 
 {¶ 22} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. In re D.A.,113 Ohio St.3d 88, 2007-Ohio-1105, at ¶ 12. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In re Adoption ofHolcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 23} The trial judge indicated that he did not doubt the love both parents have for their child. Nevertheless, he found that they had been inconsistent in their efforts to visit with the child. He also found that G.K. had less of a bond with Father than with Mother. There was no evidence of significant relationships with any other relatives. The trial judge also found that G.K. has a strong and affectionate bond with the foster parents with whom he had been placed since he was released from the hospital.
 {¶ 24} Dr. Wygant, the parenting assessor, testified that he had concerns about either of the parents caring for a child. He believed Mother was emotionally unstable, that Father failed to learn from consequences, and that both parents had poor judgment, poor decision making ability, impulsive behavior, and were prone to anger. The record demonstrates that each parent had at least one domestic violence conviction. Neither parent had a valid driver's license, but Mother knew Father continued to drive on a suspended license.
 {¶ 25} Father argues that he had a bond with his son and claims there was no criticism of his conduct at visits. The trial court has not disputed the existence of a limited bond, but the record also demonstrates that Father attended less than half the scheduled visits and declined the opportunity to engage in more visits. Parental visitation was even cancelled on occasion because of repeated lack of attendance by Mother and Father. As noted above, when Father was *Page 10 
incarcerated during this proceeding for a parole violation, he failed to inform the caseworker or the guardian ad litem. He had no contact with his child for nearly five months.
 {¶ 26} The guardian ad litem recommended that permanent custody be granted and stated her belief that the parents were not in a position to provide a safe, healthy, stable environment for the child. Father complains that the guardian ad litem focused on the unfitness of the parents as opposed to the well-being, needs, and best interest of the child. Following her general conclusory recommendation in court, the testimony of the guardian ad litem was dictated, to a large degree, by the types of questions she was asked by counsel for CSB, Mother, and Father. In addition to her testimony, however, the guardian ad litem's written report makes clear that she reviewed numerous records regarding the parents, made nearly 150 phone contacts, and made numerous personal visits to the visitation center and to the home of the foster parents. She described the child's daily schedule, appearance, general behavior, and demeanor. As well, she fully described his medical record, which included the diagnosis of a heart murmur, surgery for ear tubes, anticipated surgery for removal of tonsils and adenoids, and the diagnosis of asthma, which necessitated dozens of medical appointments and emergency care visits. Such extensive information supports the ability of the guardian ad litem to properly state her opinion on this factor.
 {¶ 27} The child has been in the custody of CSB and placed with the same foster parents for all but three days of his life. The record demonstrates that the parents have attended approximately half of the scheduled visitations and that they were all conducted on-site at the visitation center. The parents were offered an opportunity to have longer visits, but declined, citing work obligations or transportation problems. *Page 11 
 {¶ 28} Father notes that the caseworker said he was appropriate with his son and that his recent visits were said to reveal a marked improvement. Father claims that this evidenced a good relationship between himself and his son. In explaining this improvement, however, the guardian ad litem stated that, after 11 months, G.K. had gotten to a point "where the child has not cried throughout the entire visit." Even so, time spent during visitation is not the full measure of a parent-child relationship. The trial judge was also permitted to consider the great inconsistency in Father's attendance at visits, the fact that Father declined an offer of longer visits, and the fact that his visits never progressed beyond supervised on-site visitation in evaluating this factor.
 {¶ 29} Father also complains that the guardian ad litem observed the child more with the foster parents than with him and Mother. The guardian ad litem explained how that result is a function of the requirement that she must see the child on a monthly basis. The parents were known to frequently cancel their visits, making that an unreliable place to see the child.
 {¶ 30} Finally, the trial court found that the child needs a legally secure placement and that the parents were unable to provide a stable, secure home for the child. There were no suitable relatives with whom the child could be placed. The caseworker, the guardian ad litem, and the parenting evaluator all agreed that permanent custody was in the best interest of the child. The trial court concluded that adoption was the only means to achieve a permanent placement.
 {¶ 31} Father argues that the child could be placed with him within a year. By the time of the permanent custody hearing, this child has already spent eighteen months in care. The trial court did not abuse its discretion in determining that a delay of another year was not reasonable. *Page 12 
 {¶ 32} Upon review, the record demonstrates that there was ample evidence before the trial court from which it could conclude that permanent custody was in the child's best interests. Mother's third assignment of error and Father's second assignment of error are overruled.
 FATHER'S ASSIGNMENT OF ERROR I. "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED [FATHER'S] MOTION FOR SIX-MONTH EXTENSION THAT WAS SUPPORTED BY THE MANIFEST WEIGHT OF CREDIBLE EVIDENCE."
 FATHER'S ASSIGNMENT OF ERROR III. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY APPLYING THE WRONG STATUTORY STANDARD TO DENY [FATHER'S] MOTION FOR SIX MONTH EXTENSION."
 {¶ 33} In these two assignments of error, Father asserts that the trial court erred when it denied his motion for a six-month extension of temporary custody. He claims that the trial court should have based its decision on a best interest determination and also claims that the child could be placed with him within a year.
 {¶ 34} Having previously determined that the record contains ample evidence from which the trial court could conclude that G.K. could not be placed with Father within a reasonable time or should not be placed with him and also that permanent custody was in the child's best interest, this Court concludes that the trial court did not err in denying Father's motion for an extension of temporary custody. Father's first and third assignments of error are overruled.
 III. {¶ 35} Mother's three assignments of error are overruled. Father's three assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed. *Page 13 
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellants.
 SLABY, J. WHITMORE, J. CONCUR *Page 1